IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VICTOR W. PATTERSON, TOBY G. BREEDLOVE, and JEANNINE B. RULIS (f/k/a CHARLOTTE JEANNINE BREEDLOVE), | : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. |
| vs. | : : | 1:11-CV-0339-CC |
| CITIMORTGAGE, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., | : : : : | |
| Defendants. | : | |

## OPINION AND ORDER

Pending before the Court in the above-styled action is Defendant CitiMortgage, Inc. and Mortgage Electronic Registration System, Inc.'s Motion for Summary Judgment [Doc. No. 35]. For the reasons stated below, the Court **GRANTS in part and DENIES without prejudice in part** the Motion for Summary Judgment.

## I.     BACKGROUND

### A.     Facts

On or about May 1, 2007, Plaintiff Toby Breedlove ("Breedlove") obtained a loan from CitiMortgage, Inc. ("CitiMortgage") in the original principal amount of $550,000 (the "Loan" or "Breedlove Loan"). (The CitiMortgage Defs.' Statement of Undisputed Material Facts "DSUMF" ¶ 1.) At the time Breedlove obtained the Loan, he was self-employed in the field of real estate development and construction. (DSUMF ¶ 2.) In connection with the Loan, Breedlove signed a Promissory Note in favor of CitiMortgage, wherein he agreed and promised, among other things, to repay the Loan in its entirety. (DSUMF ¶ 3.) Also in connection with the Loan, Breedlove and his then-wife, Plaintiff Charlotte Jeannine Breedlove n/k/a Jeannine

B. Rulis, (collectively referred to herein as the "Breedloves") signed a Security Deed in favor of MERS, as nominee of CitiMortgage and its successors and assigns, wherein the Breedloves granted MERS a first priority security interest in and to the real property located at 2382 Old Fountain Road, Lawrenceville, Georgia 30043 (the "Property") to secure Breedlove's indebtedness to CitiMortgage under the Note (the "Security Deed").[1]  (DSUMF ¶ 4.)  The Security Deed was recorded on May 15, 2007, at Deed Book 47887, Page 804 of the Gwinnett County, Georgia, real estate records. (DSUMF ¶ 5.)

Breedlove agreed and understood at the time he obtained the Loan that if he did not pay the Loan according to its terms, CitiMortgage would be authorized to foreclose on the Property.  (DSUMF ¶ 6.)  Breedlove fell behind on his monthly mortgage payments to CitiMortgage, and the Loan went into default.  (DSUMF ¶ 7.)

In an effort to avoid foreclosure of the Property as a result of his default on the Loan, Breedlove called the telephone number off of a sign in his neighborhood for a company called "SameDayHouseBuyers" that read "We Buy Houses" to see if he could locate someone who would be interested in purchasing the Property. (DSUMF ¶ 9.)  Plaintiff Victor Patterson ("Patterson"), doing business as SameDayHouseBuyers, received and returned Breedlove's telephone call regarding a potential sale of the Property.  (DSUMF ¶ 10.)  Patterson has a bachelor of science degree in accounting and has been employed as a certified public accountant and as a chief financial officer.  (DSUMF ¶ 11.)  Patterson, doing business as SameDayHouseBuyers, was in the business of purchasing distressed properties for investment, rental, and/or resale.  (DSUMF ¶ 12.)

Patterson and Breedlove agreed that Breedlove would authorize Patterson to communicate directly with CitiMortgage about the Loan, and that Patterson would

---

[1]	Plaintiffs' response to this fact is not concise and nonargumentative, as required by Local Rule 56.1(B)(2)(a)(1), and does not directly refute the movant's fact. Accordingly, the Court deems this fact admitted pursuant to Local Rule 56.1(b)(2)(a)(2).

seek to purchase the Property through a negotiated "short sale" with CitiMortgage. (DSUMF ¶ 13.) Breedlove signed a letter of authorization form that authorized CitiMortgage to communicate directly with Patterson about the Loan and the potential short sale of the Property. (DSUMF ¶ 14.) The form letter of authorization Breedlove executed was one of many forms provided to Patterson by two individuals who were participating in Patterson's real estate investment endeavors, and with whom Patterson expected to share the profits he anticipated from resale or rental of the Property. (DSUMF ¶ 15.) The Breedloves were not involved with, and did not participate in, any of the communications between Patterson and CitiMortgage regarding the proposed short sale of the Property. (DSUMF ¶ 21.)

Patterson first began communicating with CitiMortgage about the Loan and the potential short sale of the Property in July 2008. (DSUMF ¶ 16.) At that time, Patterson was aware that Breedlove owed "in the five hundred thousand range" on the Loan. (DSUMF ¶ 17.)

Todd Stone ("Stone"), a short sale specialist employed by CitiMortgage in the loss mitigation department, was vested with the authority to communicate on CitiMortgage's behalf regarding payoff amounts in short sale situations. (DSUMF ¶ 18; Pls.' Statement of Material Facts that Remain in Dispute "PSMF" ¶ 3.) Stone initially was assigned to be the CitiMortgage representative that was responsible for communicating with Patterson about the proposed short sale of the Property. (DSUMF ¶ 18.) In his capacity as a short sale specialist, Stone was responsible for reviewing and evaluating the short sale offers that Patterson submitted for the Property to determine whether, based on the value of the Property and the outstanding balance owed on the underlying Loan for which the Property served as collateral, the net payout to CitiMortgage that was proposed within the various offers was more than CitiMortgage could reasonably expect to receive from a sale of the Property if it were to go through the foreclosure and post-foreclosure

marketing process.[2] (DSUMF ¶ 19.)

Stone had several telephone conversations with Patterson between July 2008 and September 2008 regarding the proposed short sale. (DSUMF ¶ 22.) During these conversations, Stone informed Patterson that CitiMortgage would not agree to a short sale unless the net payout that CitiMortgage would receive in connection with the short sale was more than CitiMortgage could reasonably expect to receive from a sale of the Property if it were to go through the foreclosure and post-foreclosure marketing process. (Id.) Stone also informed Patterson during their telephone conversations that the amount that CitiMortgage would be willing to accept in a short sale of the Property would be based on the market value of the Property, as well as the amount of the outstanding balance that was owed on the Breedlove Loan. (DSUMF ¶ 23.) According to CitiMortgage's records, in or around August 2008, the Property was valued at approximately $600,000, but the parties dispute whether an appraisal of the Property was actually done in or around August 2008. (DSUMF ¶ 24; Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 24.) The total outstanding balance that Breedlove owed CitiMortgage on the Loan as of August 2008 was $563,709.90. (DSUMF ¶ 25.)

In August 2008, Patterson submitted his initial short sale proposal package to CitiMortgage, at which time he offered to purchase the Property for the price of

_____

[2]      Plaintiffs admit this fact in part and state they are without sufficient information to admit or deny the remainder of the information contained in Paragraph 19. Plaintiffs request pursuant to Federal Rule of Civil Procedure 56(d) that they be permitted to depose Stone to enable them to gather sufficient information to evaluate Paragraph 19 in its entirety. Plaintiffs, however, have not complied with the requirement of Rule 56(d) that they "show[ ] by affidavit or declaration that, for specified reasons, [they] cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Moreover, the Court's familiarity with the procedural history of this case informs that Plaintiffs had ample time to take depositions in this case but did not act diligently to do so. Accordingly, Plaintiffs' Rule 56(d) request in response to this fact and similar requests made in response to other facts asserted by Plaintiffs (i.e., DSUMF ¶¶ 24, 25, 28, 30, 38, 39, 44, 80, 81, 83, 85, and 86) are denied. These facts are deemed admitted.

$371,000, which would have provided a net payout to CitiMortgage in the amount of $350,000 (the "First Proposal"). (DSUMF ¶ 26.) CitiMortgage rejected Patterson's First Proposal. (DSUMF ¶ 27.) CitiMortgage did not, and would not, agree to accept a net payout of $350,000 in connection with the proposed short sale of the Property because that amount was far less than the outstanding balance that was owed on the Loan (which exceeded $563,000 at that time) and because, according to CitiMortgage's records, the Property was valued at approximately $600,000 at that time. Thus, CitiMortgage believed that it could reasonably expect to receive more than $350,000 from a sale of the Property if it were to go through the foreclosure and post-foreclosure marketing process. (DSUMF ¶ 28.)

After CitiMortgage rejected Patterson's First Proposal, Patterson orally offered to purchase the Property for the purchase price of $412,000, which would have provided an approximate net payout to CitiMortgage in the amount of $391,940 (the "Second Proposal"). (DSUMF ¶ 29.) CitiMortgage rejected Patterson's Second Proposal because it was still far less than the outstanding balance that was owed on the Loan and because, based on the estimated value of the Property at that time, CitiMortgage believed that it could reasonably expect to receive more than $391,940 from a sale of the Property if it were to go through the foreclosure and post-foreclosure marketing process. (DSUMF ¶ 30.) During their negotiations about the potential short sale, Patterson disputed CitiMortgage's valuation of the Property. (DSUMF ¶ 31.)

On August 29, 2008, Stone received a facsimile from Patterson containing a third short sale proposal wherein Patterson offered to purchase the Property for a purchase price of $444,000, which would have provided a net payout to CitiMortgage in the amount of $412,620 (the "August 29 Proposal"). (DSUMF ¶ 32.) Included in Patterson's August 29 Proposal to CitiMortgage was an "Agreement to Sell Real Estate" dated August 20, 2008, and entered into by and between Breedlove and Patterson, doing business as SameDayHouseBuyers, and a proposed HUD-1

settlement statement evidencing a purchase price of $444,000 with a net payout to CitiMortgage in the amount of $412,620. (DSUMF ¶ 33.) Included on the proposed HUD-1 settlement statement was a "Mortgage Tax Stamp" fee in the amount of $13,320, which was to be deducted from CitiMortgage's payout. (DSUMF ¶ 34.) Stone discussed the Mortgage Tax Stamp fee with Patterson and informed Patterson that the proposed fee in the amount of $13,320 should be reduced to $2,000, which would result in an adjustment to CitiMortgage's net payout. (DSUMF ¶ 35.) Patterson admits that he could have made an error in calculating the Mortgage Tax Stamp fee on the proposed HUD-1 settlement statement he submitted with the August 29 Proposal. (DSUMF ¶ 36.) Stone determined that if the Mortgage Tax Stamp fee was reduced from $13,320 to $2,000, the net payout to CitiMortgage would be $423,940. (DSUMF ¶ 37.)

Stone recommended to his supervisors that CitiMortgage agree to accept the August 29 Proposal, if Patterson would agree to reduce the Mortgage Tax Stamp fee from $13,320 to $2,000. (DSUMF ¶ 38.) Based upon Stone's recommendation, CitiMortgage determined that it could not accept Patterson's August 29 Proposal, which provided a net payout to CitiMortgage of $412,620, although if the Mortgage Tax Stamp fee could be reduced per Stone's calculations, CitiMortgage would agree to a short sale of the Property providing a net payout to CitiMortgage in the amount of $423,900. (DSUMF ¶ 39.) Accordingly, Stone drafted a letter responding to Patterson dated September 19, 2008 (the "September 19 Letter"). (DSUMF ¶ 41.) However, when Stone prepared the September 19 Letter, he used as a template a standard CitiMortgage short payoff form that had been used for a prior unrelated loan that showed a payoff amount of $113,968.45. (DSUMF ¶ 42.) In preparing the September 19 Letter, Stone inadvertently failed to change the short payoff amount on the form letter from the incorrect amount of $113,968.45 to the correct amount of $423,940. (DSUMF ¶ 43.) The amount of $113,968.45 had no bearing or relation whatsoever to the Loan or the proposed short sale of the Property, and the reference

of that amount on the September 19 Letter was nothing more than an inadvertent clerical error on Stone's part. (DSUMF ¶ 44.) Still, the September 19 Letter correctly identified the debtor as Breedlove, the account number for the Breedlove Loan, and the subject property address. (PSMF ¶¶ 16-18.)

The September 19 Letter provides that CitiMortgage would accept a minimum amount of $113,968.45 or the net proceeds from the closing settlement, whichever is greater. (PSMF ¶ 19.) The September 19 Letter further states, in pertinent part, that CitiMortgage will release its lien on the Property "[u]pon receipt of certified funds or title company escrow check and after a final review of the original (or certified copy) HUD-1 settlement statement." (DSUMF ¶ 46.)

The September 19 Letter was sent to Patterson via facsimile on September 19, 2008. (DSUMF ¶ 47.) Patterson had no further communications or conversations with Stone after receiving the September 19 Letter. (DSUMF ¶ 48.) Patterson never contacted Stone at any time to inquire about the $113,968.45 amount that appeared in the September 19 Letter. (DSUMF ¶ 50.)

In late September 2008, Stone was promoted to team manager and Lee Riley ("Riley"), a loss mitigation specialist, was assigned to replace Stone as the CitiMortgage representative who was responsible for communicating with Patterson about the proposed short sale of the Property. (DSUMF ¶ 52.) Patterson had two telephone conversations with Riley regarding the proposed short sale of the Property, the first of which occurred on or about October 7, 2008, and the second of which occurred on or about October 22, 2008. (DSUMF ¶ 53.)

On October 7, 2008, Riley informed Patterson that he had been assigned to replace Todd Stone as the CitiMortgage representative who was responsible for communicating with him about the proposed short sale of the Property, and asked Patterson to confirm that the closing of the proposed short sale was going forward on a date certain. (DSUMF ¶ 54.) Riley did not specifically discuss the $113,968.45 amount that appears in the September 19 Letter with Patterson during their

telephone conversation on October 7, 2008, but Riley did advise Patterson that he would be reviewing the file and would work on the sale through closing. (DSUMF ¶ 55; Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 55.) Riley did not discuss with Patterson during their telephone conversation on October 7, 2008, or at any other time, the specific purchase price for the Property or the net payout amount that CitiMortgage would agree to accept in connection with the proposed short sale of the Property. (DSUMF ¶ 56.)

On October 15 and 22, 2008, Riley left messages on Patterson's answering machine requesting that he confirm that the closing of the proposed short sale of the Property was going forward. (DSUMF ¶¶ 57, 58.) On October 22, 2008, Patterson returned Riley's telephone call and confirmed to Riley that the closing of the proposed short sale was going forward on October 23, 2008. (DSUMF ¶ 59.) Riley did not specifically discuss the $113,968.45 amount that appears in the September 19 Letter with Patterson during their telephone conversation on October 22, 2008, or at any time. (DSUMF ¶ 60, 62.) Patterson admits that he did not specifically discuss the $113,968.45 amount that appears in the September 19 Letter with Riley. (DSUMF ¶ 65.) However, Riley did warn Patterson that the sale terms were such a "good deal" that the closing deadline would not be extended. (PSMF ¶ 6.)

Patterson scheduled a closing of the proposed short sale to take place on October 23, 2008, at the law firm of O'Kelley and Sorohan, LLC (the "Closing"). (DSUMF ¶ 67.) Immediately before the Closing, Patterson commissioned an appraisal of the Property, which valued the Property at $500,000. (DSUMF ¶ 68.) In addition, before the Closing, Patterson was informed that CitiMortgage had an appraisal/broker's opinion of the Property in the amount of $600,000, with an adjusted market value of $529,000, but Plaintiffs dispute that such an appraisal of the Property was performed. (DSUMF ¶ 69; Pls.' Response to Defs.' Statement of Undisputed Material Facts ¶ 69.) In connection with the Closing, and based on the September 19 Letter, Patterson prepared a new version of the "Agreement to Sell

Real Estate," wherein the purchase price for the Property was shown as $115,750.29 with a net payout to CitiMortgage in the amount of $113,968.45. (DSUMF ¶ 70.)

Patterson obtained a $130,000 loan from a private lender, Robert Massey, to finance the purchase of the Property in connection with the purported short sale. (DSUMF ¶ 71.) The loan Patterson obtained from Robert Massey was a six-month loan. (DSUMF ¶ 72.)

Patterson and Breedlove attended the Closing of the purported short sale on October 23, 2008, at which time O'Kelley & Sorohan employee Stephanie Bush faxed to Riley a copy of the revised "Agreement to Sell Real Estate," a revised HUD-1 settlement statement showing the purchase price of $115,750.29 with a net payout to CitiMortgage in the amount of $113,968.45, and a wire confirmation evidencing a net payout to CitiMortgage in the amount of $113,968.45. (DSUMF ¶ 73.) In connection with the Closing, Patterson and Breedlove executed an Acknowledgment and Receipt of Settlement Statement (the "Acknowledgment"), which stated, in pertinent part, that "[p]urchaser and seller agree that should any inadvertent errors or omissions later be discovered in any documents executed at settlement, they shall promptly execute corrective documents and remit such sums as may be required to adjust or correct such errors or omissions." (DSUMF ¶ 74.) The Acknowledgment executed by Patterson and Breedlove also stated, in pertinent part, that "[i]f any party receiving payoff as set forth in the settlement statement refuses to accept that amount tendered, the party obligated to make such payoff (purchaser or seller) agrees to immediately pay to settlement agent sufficient additional funds to make such payment acceptable to the refusing/receiving party." (DSUMF ¶ 75.)

Funds in the amount of $113,968.45 from Patterson's lender, Robert Massey, were disbursed by wire transfer from O'Kelley & Sorohan to CitiMortgage on October 23, 2008, in connection with the Closing. (DSUMF ¶ 76.) Patterson received funds in excess of $9,000 in connection with the Closing. (DSUMF ¶ 77.)

Upon review of the documents faxed to Riley by Stephanie Bush on October

23, 2008, after the Closing, Riley immediately realized that there must have been some error because $113,968.45 was far less than CitiMortgage had agreed to accept in connection with the short sale of the Property. (DSUMF ¶ 78.) In researching the source of the error, Riley reviewed the September 19 Letter from Todd Stone and realized that it contained a typographical error referencing a net payout figure of $113,968.45. (DSUMF ¶ 79.) Riley's research also revealed that the $113,968.45 was an amount that had appeared on another payoff letter for an unrelated loan that Todd Stone had prepared on or about September 19, 2008. (DSUMF ¶ 80.)

When Riley discovered the error on the September 19 Letter, he alerted his supervisors who instructed him to report the problem to CitiMortgage attorney Ammy Le. (DSUMF ¶ 81.) Riley informed Le about the Closing and told her that CitiMortgage had received funds from the Closing in the amount of $113,968.45, which was far less than the $423,940 that CitiMortgage previously had agreed to accept in connection with the short sale of the Property. (DSUMF ¶ 82.) Riley also showed Le a copy of the September 19 Letter, which referenced a short payoff amount of $113,968.45 and a HUD-1 settlement statement showing a purchase price of $115,750.29 with a net payout to CitiMortgage in the amount of $113,968.45. (DSUMF ¶ 83.) Riley explained to Le that the $113,968.45 amount appearing in the September 19 Letter was an error. (DSUMF ¶ 84.) Riley also explained to Le that the September 19 Letter should have stated that CitiMortgage would agree to accept a payoff that would provide for a net payoff to CitiMortgage in the amount of $423,940. (DSUMF ¶ 85.)

Upon being informed that CitiMortgage had not approved the amount of $113,968.45 in connection with the short sale of the Property, Le immediately attempted to contact closing attorney Russell Petersen of O'Kelley & Sorohan, LLC by telephone to inform him of this error and to let him know that CitiMortgage would be rejecting and returning the $113,968.45 in funds to his office immediately. (DSUMF ¶ 86.) Mr. Petersen was not available when Le called on October 23, 2008,

so instead Le spoke with his assistant, Stephanie Bush. (DSUMF ¶ 87.) Le informed Ms. Bush over the telephone that CitiMortgage had rejected and would be returning the $113,968.45 in funds because they had been disbursed based upon a clerical error contained in the September 19 Letter. (DSUMF ¶ 88.)

Pursuant to the instructions of his supervisors and Ms. Le, on October 23, 2008, Riley drafted and faxed a revised payoff letter to Patterson, which referenced the correct net payout of $423,940 that CitiMortgage had agreed to accept in connection with a short sale of the Property. (DSUMF ¶ 89.) Except for the payoff number and date, CitiMortgage's September 19 Letter is identical to CitiMortgage's letter dated October 23, 2008. (PSMF ¶ 22.) Also on October 23, 2008, Riley telephoned Patterson and left a message on his answering machine to advise him that CitiMortgage was rejecting and would be returning the $113,968.45 in funds that had been disbursed at the Closing because they had been disbursed based upon a clerical error in the September 19 Letter. (DSUMF ¶ 90.)

Immediately following her telephone conversation with Ms. Bush, Ms. Le drafted and faxed a confirming letter to Ms. Bush dated October 23, 2008, wherein Ms. Le confirmed that CitiMortgage was rejecting and would be returning the $113,968.45 in funds because this amount had been disbursed based upon the clerical error in the September 19 Letter. (DSUMF ¶ 92.) In her October 23, 2008 letter to Ms. Bush, Le enclosed the revised short payoff letter that referenced the correct net payout amount of $423,940, which CitiMortgage would agree to accept in connection with a short sale of the Property. (DSUMF ¶ 93.)

On October 24, 2008, Le received a letter from Patterson demanding that CitiMortgage accept the wire transfer in the amount of $113,968.45 and insisting that $113,968.45 was the amount that CitiMortgage had agreed to accept in connection with the proposed short sale of the Property. (DSUMF ¶ 94.) Upon receipt of that letter, Le called Patterson several times and left him several voice messages asking him to contact her to discuss the matter, but Patterson never returned any of her

calls. (DSUMF ¶ 95.)

CitiMortgage wired the $113,968.45 back to O'Kelley & Sorohan on October 28, 2008. (DSUMF ¶ 96.) CitiMortgage has never received funds in the amount of $423,940 from Plaintiffs. (DSUMF ¶ 97.)

In December 2010, CitiMortgage initiated foreclosure proceedings on the Property, in response to which Plaintiffs filed this lawsuit. (DSUMF ¶ 99.) CitiMortgage has not yet foreclosed on the Property. (DSUMF ¶ 100.)

Patterson currently does not pay, and is not obligated to pay, any mortgage or rent payments on or relating to the Property. (DSUMF ¶ 102.) Patterson believes that his lender, Mr. Massey, settled a claim with his title insurance carrier and thus does not intend to pursue collection of the loan made to Patterson in connection with the purported short sale. (DSUMF ¶ 103.)

Neither Patterson nor any member of his family has required medical treatment or counseling as a result of the alleged stress they claim to have suffered as a result of CitiMortgage's refusal to consummate the purported short sale. (DSUMF ¶ 104.) Breedlove has not required medical treatment or counseling as a result of the alleged stress he claims to have suffered as a result of CitiMortgage's refusal to consummate the purported short sale. (DSUMF ¶ 105.)

Patterson's credit score has not been impacted in any way by CitiMortgage's refusal to consummate the purported short sale. (DSUMF ¶ 106.) Breedlove admits that his credit score was "horrible" long before he defaulted on the Loan and before Patterson's negotiations with CitiMortgage regarding the short sale began. (DSUMF ¶ 107.) Patterson admits that he does not believe, and does not have any reason to believe, that CitiMortgage and Mortgage Electronic Registrations Systems, Inc. ("MERS") (collectively referred to herein as the CitiMortgage Defendants") intended to harm him in any way in connection with the purported short sale of the Property. (DSUMF ¶ 108.)

Plaintiff Jeannine B. Rulis, f/k/a Charlotte Jeannine Breedlove ("Rulis"), by

and through counsel, admits that she is not asserting any claims, admits that she has not suffered any damages as a result of any actions or inactions on the part of the CitiMortgage Defendants, and admits that she is not seeking relief against the CitiMortgage Defendants in this case. (DSUMF ¶ 109.) Stone, Riley and Le have never had any communication, of any kind or at any time, with the Breedloves. (DSUMF ¶ 110.)

B.    Relevant Procedural Background

On December 30, 2010, Plaintiffs Patterson, Breedlove, and Rulis (collectively referred to herein as "Plaintiffs") commenced this action against the CitiMortgage Defendants in the Superior Court of Gwinnett County, Georgia. The Complaint alleges claims for wrongful foreclosure, breach of contract, tortious interference with contractual relations, quia timet and reformation, injunctive relief, attorney's fees, and punitive and exemplary damages. By this lawsuit, Plaintiffs seek to enjoin the foreclosure of the Property, compel CitiMortgage to honor the offer to accept $113,968.45 as payoff of the Loan, quiet title to the Property so that it vests in Patterson, and compel the CitiMortgage Defendants to pay compensatory and punitive damages and attorney's fees.

On February 2, 2011, the CitiMortgage Defendants removed the action to this Court. On February 9, 2011, the CitiMortgage Defendants filed their Answer and Counterclaim. The CitiMortgage Defendants assert counterclaims against the Breedloves for breach of contract and attorney's fees. Contending that the CitiMortgage Defendants' defenses and counterclaims are baseless, the Breedloves assert a separate counterclaim to recover attorney's fees incurred in defending against the counterclaims of the CitiMortgage Defendants.

Following several extensions of the discovery period and the deadline for filing summary judgment motions, the CitiMortgage Defendants filed the instant Motion for Summary Judgment on January 31, 2012, seeking the entry of judgment in their favor on all of Plaintiffs' claims and on the CitiMortgage Defendants'

counterclaims. Plaintiff Rulis has represented through counsel that she is not asserting any claims, she has not sustained any damages, and she is not seeking any relief against the CitiMortgage Defendants in this action. However, Plaintiffs Patterson and Breedlove continue to assert their claims in this action and maintain that summary judgment is not appropriate.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 authorizes the entry of summary judgment when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party bears the initial responsibility to demonstrate that there is no genuine issue as to any material fact and that summary judgment is appropriate. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Allen v. Bd. of Public Educ., 495 F.3d 1306, 1313 (11th Cir. 2007). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When evaluating the merits of a motion for summary judgment, the court must view all evidence and factual inferences raised by the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts concerning the facts in favor of the non-moving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted). The court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

A fact is material if proof of its existence or nonexistence would affect the outcome of the case under controlling substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 247, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Additionally, an issue of fact is genuine when the evidence is such that a reasonable jury could return a

verdict in favor of the non-moving party. Id. An issue of fact is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative." Id. at 249-250. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).

## III.    ANALYSIS

### A.    Plaintiffs' Claims

#### 1.    *Breach of Contract*

The CitiMortgage Defendants maintain that they are entitled to summary judgment on Plaintiffs' breach of contract claim first because the September 19 Letter that Plaintiffs seek to enforce did not constitute a binding, enforceable agreement due to the absence of a meeting of the minds concerning the price that Patterson would pay and that CitiMortgage would agree to accept. The CitiMortgage Defendants likewise make the equitable argument that Plaintiffs should not be able to take unfair advantage of the obvious, patent mistake that appears in the September 19 Letter. The CitiMortgage Defendants finally argue that Plaintiffs cannot prevail on the breach of contract claim because the contract lacks consideration and Plaintiffs have not suffered any damages. As fully explained below, the Court agrees with the CitiMortgage Defendants that the September 19 Letter is not a valid contract.

Under Georgia law, a party asserting a breach of contract claim has the burden of proving (1) there were parties able to contract, (2) consideration, (3) mutual assent of the parties to all of the contract terms, and (4) a subject matter upon which the contract can operate. O.C.G.A. § 13-3-1. Once the party establishes the existence of a valid contract, the party then has the burden of proving the following elements of a breach of contract claim: (1) breach of that contract; (2) damages resulting therefrom; (3) to the party who has the right to complain about the contract

being broken.  <u>Kuritzky v. Emory Univ.</u>, 294 Ga. App. 370, 371, 669 S.E.2d 179 (2008) (citation omitted).

The CitiMortgage Defendants present evidence that Stone made a clerical error when he failed to change the $113,968.45 payoff amount in the September 19 Letter.  The CitiMortgage Defendants assert that CitiMortgage's intent was to state that CitiMortgage would agree to accept $423,940 as payoff in connection with the short sale.  The CitiMortgage Defendants thus argue that CitiMortgage never assented to the $113,968.45 payoff amount, and they contend that the September 19 Letter lacks the mutual assent necessary for the writing to constitute an enforceable agreement.

Plaintiffs argue in response that the September 19 Letter is a clear, unambiguous writing that the CitiMortgage Defendants should not be able to alter or contradict relying on parol evidence.  Plaintiffs assert that the September 19 Letter is a binding contract that the Court should enforce as written, since Plaintiffs complied with all terms set forth in the September 19 Letter prior to CitiMortgage's attempt to withdraw the payoff offer set forth therein.

Plaintiffs' admissions make this Court's consideration of parol evidence unnecessary, as Plaintiffs concede that CitiMortgage never intended to offer $113,968.45 as an amount CitiMortgage would accept in connection with the proposed short sale of the Property.  In this regard, Plaintiffs state the following in their summary judgment briefing: "The evidence shows that Defendant CitiMortgage, Inc. . . . apparently made a unilateral mistake in the written contract it submitted to Plaintiff Victor Patterson.  In particular, the bank offered to accept $113,968.45 as a payoff of Plaintiff Toby Breedlove's debt, when the bank intended to ask for a much higher figure."  (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. at 1.)  In light of Plaintiffs' acknowledgment that CitiMortgage did not intend to offer to accept $113,968.45, the Court rejects Plaintiffs' argument that there was a meeting of the minds as to that essential term.

Further, even if Plaintiffs' admissions did not resolve the issue, the Court finds that parol evidence is admissible in this case and that the parol evidence presented establishes that the parties did not mutually assent to the payoff term set forth in the September 19 Letter. As a general rule, parol evidence is not admissible to contradict a valid, unambiguous written contract. <u>Frank v. Fleet Finance, Inc. of Ga.</u>, 227 Ga. App. 543, 546, 489 S.E.2d 523 (1997) (citations omitted); <u>BellSouth Adver. & Publ'g Corp. v. McCollum</u>, 209 Ga. App. 441, 444, 433 S.E.2d 437 (1993). However, "parol evidence may be used to show no valid agreement ever went into existence." <u>BellSouth</u>, 209 Ga. App. at 444 (punctuation and citation omitted). Moreover, "[p]arol evidence is admissible to prove a mistake in a deed or any other contract required by law to be in writing." O.C.G.A. § 24-6-7. Georgia's Statute of Frauds provides that "[a]ny contract for sale of lands, or any interest in, or concerning lands," must be in writing. O.C.G.A. § 13-5-30(4). Accordingly, "the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." <u>Cox Broadcasting Corp. v. Nat'l Collegiate Athletic Assn.</u>, 250 Ga. 391, 395, 297 S.E.2d 733 (1982). "Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury." <u>Legg v. Stovall Tire & Marine, Inc.</u>, 245 Ga. App. 594, 596, 538 S.E.2d 489 (2000) (citations omitted).

Here, the extrinsic evidence establishes that there was never any meeting of the minds regarding the price that Patterson would agree to pay and that CitiMortgage would agree to accept in connection with the proposed short sale of the Property. There is no dispute that, prior to the September 19 Letter, Patterson made two offers for the purchase of the Property, which each would have resulted in a net payout to CitiMortgage that exceeded $113,968.45 by over $200,000.00. There further is no dispute that CitiMortgage rejected both of these offers because CitiMortgage believed that it could reasonably expect to receive more than Patterson

had offered from a sale of the Property if it were to go through the foreclosure and post-foreclosure marketing process. Patterson then undisputedly made a third offer for the purchase of the Property, which would have resulted in a net payout to CitiMortgage in the amount of $412,620.00. CitiMortgage did not accept this offer but responded in writing with the September 19 Letter, which included the erroneous payoff amount of $113,968.45. CitiMortgage obviously did not intend to offer this payoff amount, as CitiMortgage had already rejected three offers that far exceeded $113,968.45. Moreover, Patterson admitted in his deposition that he never specifically discussed the $113,968.45 figure with any CitiMortgage representative at any time. The evidence reflects that CitiMortgage did not approve and would not have approved the $113,968.45 payoff amount. As such, the parol evidence presented supports the conclusion that there was no meeting of the minds with respect to the $113,968.45 payoff amount.

Plaintiff primarily relies on three cases in an effort to persuade the Court to reach a contrary conclusion: Decision One Mortg. Co. v. Victor Warren Props., Inc., 304 Ga. App. 423, 696 S.E.2d 145 (2010); Malin v. Servisco, Inc., 172 Ga. App. 418, 323 S.E.2d 278 (1984); and Davis v. United Am. Life Ins. Co., 215 Ga. 521, 111 S.E.2d 488 (1959). Significantly absent in each of these three cases, however, is a party seeking enforcement of a contract who conceded that the opposing party did not intend to agree to one of the contract's essential terms. In light of this distinction, the Court does not find any of the cases on which Plaintiffs rely controlling or persuasive.[3]

In sum, the Court is convinced that CitiMortgage's clerical error was the type

---

[3]      Additionally, in Decision One, the court's analysis focused on whether the trial court should have exercised its equitable powers to rescind the contract based on the defendant's unilateral mistake. The Decision One court did not address whether there was mutual assent or a meeting of the minds. In contrast, this Court's focus is on whether a valid contract was formed in the first place. Having answered this question in the negative, the Court need not address whether the Court should invoke its equitable powers to rescind the contract. No valid contract was formed.

of error that prevented a meeting of the minds and the formation of a valid contract. In other words, CitiMortgage did not knowingly agree to a payoff amount and then learn of information, such as an appraisal error, that made its agreement to that payoff amount a mistake. Instead, the payoff amount in the September 19 Letter was erroneous from the outset and was not an amount to which CitiMortgage ever intended to agree. Because there was no meeting of the minds with respect to this essential term, no valid contract exists. BellSouth, 209 Ga. App. at 444; Scott v. Gillis, 202 Ga. 220, 224, 43 S.E.2d 95 (1947). Plaintiffs' breach of contract claim cannot survive summary judgment.

### 2. *Wrongful Foreclosure*

The CitiMortgage Defendants next argue that they are entitled to summary judgment on Plaintiffs' claim for wrongful foreclosure because this claim is premised on the incorrect theory that the September 19 Letter constituted a valid contract and because MERS is authorized to foreclose on the Property. The Court agrees with the former argument and recognizes that there is a split of authority with respect to the latter argument and that the question of whether a deed holder that does not also hold the note or have an interest in the underlying debt obligation can validly institute foreclosure proceedings has been certified to the Supreme Court of Georgia.

### a. **Existence and Breach of Duty**

"Georgia law requires a plaintiff asserting a claim of wrongful foreclosure to establish a legal duty owed to it by the foreclosing party, a breach of that duty, a causal connection between the breach of the duty and the injury it sustained, and damages." DeGolyer v. Green Tree Servicing, LLC, 291 Ga. App. 444, 448, 662 S.E.2d 141 (2008). In the instant case, Plaintiffs contend that the source of the CitiMortgage Defendants' duty not to foreclose on the Property is the September 19 Letter. However, the Court has already held that the September 19 Letter is not an enforceable agreement. Consequently, the Breedlove Loan remains in default, and

the CitiMortgage Defendants did not owe or breach any duty that would form the basis of a wrongful foreclosure claim.

### b. Authority of MERS to Foreclose

Regarding Plaintiffs' argument that MERS lacks standing to prosecute the foreclosure of the Property based on the fact that MERS does not own or possess the promissory note associated with the Security Deed, this Court agrees with the majority of judges on this Court who have considered the issue and held that the holder of a security deed need not also possess or hold the note to conduct foreclosure proceedings validly under Georgia law. See Howard v. Mortg. Elec. Registration Sys., Inc., No. 1:10–cv–1630–WSD, 2012 WL 3582586, at *5 (N.D. Ga. Aug. 17, 2012) (holding that plain language of security deed foreclosed the plaintiff's argument that MERS lacked standing to foreclose on property); Montoya v. Branch Banking & Trust Co., No. 1:11-cv-1869-RWS, 2012 WL 826993, at *5 (N.D. Ga. Mar. 9, 2012) (rejecting wrongful foreclosure claim to the extent that it was based on a note-splitting theory); Alexis v. Mortg. Elec. Registration Sys., Inc., No. 1:11-cv-1967-RWS, 2012 WL 716161, at *3 (N.D. Ga. Mar. 5, 2012) (holding that Georgia law does not preclude the holder of a security deed from initiating foreclosure if it does not also hold the note and finding that the plain language of the deed granted MERS and its assignee the right to foreclose); Nelson v. Bank of Am., N.A., No. 1:11-cv-3980-TWT, 2012 WL 315400, at *2 (N.D. Ga. Jan. 31, 2012) (rejecting argument that foreclosure was invalid because the entity prosecuting the foreclosure did not possess the note and security deed); Rainey v. FMF Capital, LLC, No. 1:11–cv–0364–CAP (N.D. Ga. Mar. 30, 2012) (dismissing wrongful foreclosure claim to the extent it is premised on MERS's lack of power to foreclose on its own); Kabir v. Statebridge Co., No. 1:11-cv-2747-WSD, 2011 WL 4500050, at *6 (N.D. Ga. Sept. 27, 2011) (holding that the plaintiff's allegation that MERS lacked the authority to foreclose failed to state a claim upon which relief could be granted); Jackman v. Hasty, Civil Action No. 1:10–cv–2485–RWS, 2011 WL 854878, at *3-4 (N.D. Ga. Mar.

8, 2011) (rejecting plaintiff's argument that holder of a security deed cannot proceed with foreclosure sale if it does not also possess the promissory note, particularly when the plain language of the deed gives the deed holder the right to foreclose); <u>Brown v. Fed. Nat'l Mortg. Ass'n</u>, No. 1:10–cv–03289–TWT–GGB, 2011 WL 1134716, at *6 (N.D. Ga. Feb. 28, 2011) (rejecting plaintiff's argument that assignee of MERS did not have the authority to foreclose, because the borrower had granted and conveyed the property to MERS with power of sale and MERS had validly conveyed that right to the assignee when it assigned the security deed); <u>LaCosta v. McCalla Raymer, LLC</u>, No. 1:10-cv-1171-RWS, 2011 WL 166902, at *6 (N.D. Ga. Jan. 18, 2011) (holding that plaintiff failed to state a claim because the plaintiff granted to MERS in the security deed "the right to foreclose and sell the property" and deeds are "construed in favor of allowing exercise of the power of sale"); <u>Nicholson v. OneWest Bank</u>, No. 1:10–cv–0795–JEC/AJB, 2010 WL 2732325, at *4 (N.D. Ga. Apr. 20, 2010) ("[T]he nominee of the lender has the ability to foreclose on a debtor's property even if such nominee does not have a beneficial interest in the note secured by the mortgage.").

Consistent with this position, Georgia law holds "that a security deed which includes a power of sale is a contract and its provisions are controlling as to the rights of the parties thereto and their privies." <u>Kennedy v. Gwinnett Commercial Bank</u>, 155 Ga. App. 327, 328, 270 S.E.2d 867 (1980). The Security Deed signed by Breedlove provides that "MERS (as nominee for [CitiMortgage] and [CitiMortgage's] successors and assigns), has the right to: exercise any or all of [the interests granted by Breedlove in the Security Deed], including, but not limited to, the right to foreclose and sell the Property . . . ." (Ex. 8 to Deposition of Toby G. Breedlove "Breedlove Dep." at p. 3.) Based on the express language of this valid contract, the Court believes that MERS, as nominee for CitiMortgage, had the authority to foreclose on the Property.

Notwithstanding the foregoing, the Court is aware that there is contrary

authority in this district. Specifically, in <u>Morgan v. Ocwen Loan Servicing, LLC</u>, 795 F. Supp. 2d 1370 (N.D. Ga. 2011), the Honorably Amy Totenberg held that a borrower had properly stated a claim for wrongful attempted foreclosure where an assignee of a security deed from MERS instituted foreclosure proceedings on its own behalf without also holding the note. <u>Id.</u> at 1376. More recently, in <u>Stubbs v. Bank of America</u>, 844 F. Supp. 2d 1267 (N.D. Ga. 2012), Judge Totenberg expressly concluded based on her careful review of Georgia law that "Georgia statutes and case law require the holder of the loan to carry out the foreclosure and to identify itself as the secured creditor of public record prior to the foreclosure sale." <u>Id.</u> at 1273 n.3.

In light of this split of authority, the Honorable Julie E. Carnes recently certified to the Supreme Court of Georgia the question of whether the holder of a security deed must also possess the note in order to prosecute a foreclosure. <u>See</u> <u>Chae Ti You v. JPMorgan Chase Bank, N.A.</u>, 1:12-CV-202-JEC-AJB, 2012 WL 3904363, at *6 (N.D. Ga. Sept. 7, 2012). Chief Judge Carnes also certified the question of whether the secured creditor must be identified in the foreclosure notice. <u>See</u> <u>id.</u> at *9. Given the pendency of these questions before the Supreme Court of Georgia, the Court finds that the best course of action in this case is not to resolve Plaintiffs' wrongful foreclosure claim at this time. Pending resolution of the certified questions by the Supreme Court of Georgia, the Court will deny without prejudice the CitiMortgage Defendants' Motion for Summary Judgment with respect to this claim.[4]

### 3.    *Tortious Interference with Contractual Relations*

With respect to Plaintiffs' claim for tortious interference with contractual relations, the CitiMortgage Defendants assert that summary judgment is warranted

---

[4]    The Court will not rule at this time on whether summary judgment should be granted with respect to Plaintiffs' claim for emotional distress damages related to the alleged wrongful foreclosure.

because CitiMortgage had a direct economic interest in the Property and thus was not a stranger to the sales contract between Patterson and Breedlove. The Court agrees.

To recover on a claim of tortious interference with contractual relations, a plaintiff must prove the following elements:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Blakey v. Victory Equip. Sales, Inc., 259 Ga. App. 34, 38, 576 S.E.2d 288 (2002) (citation omitted). "[O]nly a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract may be liable for tortious interference." Perry Golf Course Dev., LLC v. Housing Auth. of City of , 294 Ga. App. 387, 390, 670 S.E.2d 171 (2008) (punctuation and citation omitted). "Where a defendant has a financial interest in one of the parties to the contract or in the contract, the defendant is not a stranger to the contract or business relationship, even though it is not a signatory to the contract." Tidikis v. Network for Med. Commc'ns & Research, LLC, 274 Ga. App. 807, 813, 619 S.E.2d 481 (2005).

CitiMortgage was not a stranger to the contract between Patterson and Breedlove and thus cannot be liable for a claim of tortious interference with contractual relations. Here, CitiMortgage has a direct economic interest in the Property, which was the subject of the contract between Patterson and Breedlove. In fact, the sales contract between Patterson and Breedlove was dependent upon CitiMortgage's agreement to the terms of the proposed short sale. Since CitiMortgage is not a stranger to the sales contract entered into by Patterson and Breedlove, the CitiMortgage Defendants are entitled to summary judgment on the tortious interference claim.

4.     *Quia Timet and Reformation*

The CitiMortgage Defendants likewise are entitled to summary judgment on Plaintiffs' claims for quia timet and reformation. These claims are based on Plaintiffs' contentions that the Property was properly conveyed to Patterson and that CitiMortgage has wrongfully refused to release its interest in the Property. Plaintiffs allege that this refusal wrongfully creates a cloud on Patterson's title, and Plaintiffs thus seek reformation of the Security Deed to show that it is satisfied and an order from the Court clearing all interests to the Property other than Patterson's full and complete ownership. Based on the Court's holding above that the September 19 Letter did not constitute a valid, enforceable contract, CitiMortgage was not obligated and still is not obligated to satisfy the Loan, release the Security Deed, forbear from foreclosure or take any other action pursuant to the September 19 Letter. Consequently, Plaintiffs cannot prevail on their claims for quia timet and reformation.

5.     *Injunctive Relief*

The CitiMortgage Defendants are entitled to summary judgment on Plaintiffs' claim for injunctive relief because Plaintiffs cannot show a substantial likelihood of success on the merits of their claims. To obtain injunctive relief, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits of their claims; (2) that irreparable harm will be suffered in the absence of an injunction; (3) the threatened harm outweighs the harm the relief would inflict on the party opposing the issuance of the injunction; and (4) an injunction would serve the public interest. Moody Nat'l RI Atlanta H, LLC v. RJL III Fin. Atlanta, LLC, 1:09-cv-3676-WSD, 2010 WL 163296, at *3 (N.D. Ga. Jan. 14, 2010) (citations omitted).

In the instant case, all of Plaintiffs' substantive claims are meritless, except for perhaps Plaintiffs' claim for wrongful foreclosure related to the authority of MERS to foreclose on the Property. With respect to the latter claim, which the Court is staying pending resolution of the above-referenced certified questions by the

Supreme Court of Georgia, Plaintiffs have not shown a substantial likelihood of success on the merits of the claim, as this Court agrees with the majority position in this district that the holder of a security deed with the contractual authority to foreclose on a property may validly institute foreclosure proceedings, even if that entity does not hold the note. Therefore, the Court will grant the CitiMortgage Defendants summary judgment on the claim for injunctive relief.

        6.    *Punitive Damages and Attorney's Fees*

The CitiMortgage Defendants are entitled to summary judgment on Plaintiffs' claims for punitive damages and attorney's fees. The purpose of punitive damages under Georgia law is "to punish, penalize, or deter a defendant." O.C.G.A. § 51-12-5.1(c). Punitive damages may not be assessed unless Plaintiffs "prove[ ] by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Evidence is clear and convincing only if it "positively, unequivocally and clearly" establishes the proposition at issue. Card v. Singletary, 981 F.2d 481, 484 (11th 1992). In the instant case, Plaintiffs have not met this standard. In fact, both Plaintiffs admitted in their depositions that they do not believe, and do not have any reason to believe, that the CitiMortgage Defendants intended to harm them in any way. In addition, to the extent that it is ultimately determined that MERS lacked the authority to conduct the foreclosure proceedings in this case, there still is no clear and convincing evidence that MERS acted with "conscious and deliberate disregard for the interests of others" or in any manner that would justify an award of punitive damages. First Union Nat'l Bank of Ga. v. Cook, 223 Ga. App. 374, 379, 477 S.E.2d 649 (1996), overruled in part on other grounds, Golden Peanut Co. v. Bass, 249 Ga. App. 224, 233-34, 547 S.E.2d 637 (2001). In light of these admissions and the record in this case, Plaintiffs are unable to meet the high evidentiary burden that would warrant the imposition of punitive damages in any amount.

Plaintiffs also seek attorney's fees pursuant to O.C.G.A. § 13-6-11 and 51-7-83. This claim is premised on Plaintiffs' contention that the September 19 Letter is an enforceable contract that CitiMortgage failed to honor, despite Patterson's pre-litigation written request that it do so. Plaintiffs allege that "Mr. Patterson advised Defendants through their counsel of the history of this situation and the attending impropriety of the foreclosure, but Defendants insisted on pursuing a foreclosure." (Compl. ¶ 145.) Because the CitiMortgage Defendants did not resolve the dispute earlier, Plaintiffs allege that "Defendants left Plaintiffs with no alternative other than to file this action to establish good title to Mr. Patterson's home and prevent the Subject Property from being wrongly foreclosed upon." (Id. at ¶ 151.) Insofar as Plaintiffs' allegations of pre-litigation bad faith by the CitiMortgage Defendants relate to the refusal to honor the September 19 Letter, which this Court has already concluded is not a valid contract, summary judgment is appropriate with respect to Plaintiffs' attorney's fees claim. To the extent that the claim can be construed to relate also to the prosecution of the foreclosure by MERS, Plaintiffs have not pointed to any evidence of pre-litigation bad faith or abusive litigation in this regard. The existence of the split of authority, discussed <u>supra</u>, undermines any argument that MERS acted in bad faith by proceeding to conduct the foreclosure. Accordingly, the Court will grant summary judgment on Plaintiffs' claim for attorney's fees.

B.     CitiMortgage's Counterclaims

CitiMortgage is entitled to summary judgment on its counterclaims for breach of contract and attorney's fees arising out of Breedlove's default on the Loan. Although the Court recognizes that Breedlove is in a very unfortunate position as a result of the failed short sale, the undisputed evidence establishes that Breedlove is bound by the Note and Security Deed and that Breedlove breached his obligations to CitiMortgage by failing to make his Loan payments and defaulting on the Loan. Accordingly, CitiMortgage is entitled to judgment against Breedlove for breach of contract, and CitiMortgage is entitled to recover the full amount of the outstanding

loan balance.

Breedlove also agreed and acknowledged in the Security Deed that in the event of a default on the Loan, the CitiMortgage Defendants "shall be entitled to collect all expenses incurred in pursuing the remedies provided in [the Security Deed upon the event of default], including, but not limited to, reasonable attorney's fees . . . ." (Ex. 8 to Breedlove Dep. at p. 13.) Accordingly, pursuant to O.C.G.A. § 13-1-11, CitiMortgage is entitled to attorney's fees in the amount of 15 percent of the first $500.00 of principal and interest owing on the Note, and 10 percent of the amount of principal and interest owing therein in excess of $500.00.

IV.    **CONCLUSION**

For the reasons stated herein, the Court hereby **GRANTS in part and DENIES without prejudice in part** Defendants' Motion for Summary Judgment [Doc. No. 35]. Defendants' Motion for Summary Judgment is granted with respect to all of Plaintiffs' claims, except for the claim for wrongful foreclosure, and is likewise granted as to CitiMortgage's counterclaims. The Motion for Summary Judgment is denied without prejudice as to the wrongful foreclosure claim.

The Court further **ORDERS** that this case be **ADMINISTRATIVELY CLOSED** pending the Supreme Court of Georgia's resolution of the questions certified in the You case, supra.

SO ORDERED this 26th day of September, 2012.

s/  CLARENCE COOPER

CLARENCE COOPER
SENIOR UNITED STATES DISTRICT JUDGE